United States Court of Appeals
Fifth Circuit

**F I L E D**

**February 21, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————
No. 04-50308
———————————————

FRANK G. LIBERTO,

                                        Plaintiff-Appellee,

versus

D.F. STAUFFER BISCUIT COMPANY, INC.,

                                        Defendant-Appellant

-----------------------------
Appeal from the United States District Court
for the Western District of Texas

-----------------------------

Before JONES, Chief Judge, and JOLLY and HIGGINBOTHAM, Circuit
Judges.

HIGGINBOTHAM, Circuit Judge:

The parties to this dispute over trademarks and the packaging
of animal crackers have been negotiating a settlement of their
dispute over the past eleven years–while continuing their
businesses and continuing to litigate.  Today, we only add a
chapter to their saga, unable to find a principled closing.  So, we
address trademarks, licenses, and unenforceable agreements to
agree, and final judgments are anything but that.


                                I

Frank G. Liberto manufactures and distributes snack foods,
employing a design with red and yellow stripes on his packaging
since 1950.  Liberto registered his mark with the U.S. Patent and
Trademark Office in 1986.  D.F. Stauffer Biscuit Co., Inc., is a

snack food company specializing in animal crackers. In 1987, Stauffer began using red and yellow stripes on packaging similar to Liberto's mark, in connection with the sale of its animal crackers.

In 1988, Stauffer applied for registration of its package design. Although the Principal Register of Trademarks already contained Liberto's mark, Stauffer's application was approved and published in the PTO's official Gazette. Liberto did not file an opposition to the registration within the statutory period, and Stauffer's registration, number 1,561,212 ("the 212 registration") issued on October 17, 1989. Stauffer's mark became incontestably registered after October 17, 1994.

Nonetheless, in March of 1995, Liberto contacted Stauffer, alleging that Stauffer's use of the red and yellow stripes infringed upon his trademark. Stauffer denied the allegation, and Liberto filed his initial action against Stauffer, "the 1996 litigation."

Over three years later on May 29, 1998, the parties executed a settlement agreement, by which Liberto agreed to *inter alia* dismiss his infringement action, to grant an exclusive license to Stauffer for use of the striped design on Stauffer packaging. Stauffer also agreed to enforce the mark against other food manufacturers. Despite its incontestable right to use its own mark, Stauffer agreed to pay Liberto royalties for use of his design in connection with the sale of animal crackers. Stauffer

further agreed to join Liberto in a motion asking the district court to adopt the Settlement Agreement as its Final Judgment in the 1996 litigation.

The Settlement Agreement also contemplated that the parties would continue to negotiate "the specific terms of [the] license to be agreed upon." After executing the agreement, but before the joint motion for final judgment was filed, the parties negotiated the details of the license for approximately ten months without success. Liberto then urged the district court to approve the settlement agreement and enter judgment. Stauffer did not oppose the request, and, on March 22, 1999, the district court entered the Settlement Agreement as Final Judgment in the case. Neither party appealed, "ending" the 1996 litigation without an agreement over the details of the license.

After judgment was entered, the parties continued to negotiate the details of the license agreement. In particular, the parties could not agree whether Stauffer owed back-royalty payments from the date the Settlement Agreement was originally executed. Without resolving that issue, Stauffer agreed that it was obligated to "make quarterly royalty payments" from the date of Final Judgment and issued a check in June 1999 to "confirm the agreement," followed by the first quarterly payment in August 1999.

Meanwhile, Liberto asked the district court to order arbitration of the back-royalty issue. Stauffer did not object, and the court ordered the parties into arbitration.

3

In November 1999, before any progress was made in the arbitration proceeding, Stauffer informed Liberto that it would make no further royalty payments. By the consent of both parties, the arbitration was held in abeyance for the next 21 months, in order to permit the parties to resolve their differences through negotiation. By May 2001, however, no agreement had been reached, and Liberto sought to resume arbitration.

Stauffer attempted to expand the scope of the arbitration proceedings to visit issues of the 1996 litigation, such as ownership of the mark, but the district court confined the arbitration to the start-date issue. Finally, in October 2002, the arbitrator concluded that the obligation to make royalty payments to Liberto commenced upon execution of the Settlement Agreement.

While the arbitration was pending, Liberto filed this action, "the 2002 litigation," seeking payment of royalties under the Settlement Agreement. Liberto plead federal trademark infringement, including cross-merchandising, common law trademark infringement, unfair competition, dilution, and bad faith negotiation. So, when negotiations dissolved for the last time in 2002, the parties returned to the district court to resolve "any and all remaining disputes between them."

In April 2003, while the litigation was in progress, Liberto gave notice to Stauffer that its license to use the striped mark on its packaging would be terminated in May, if it failed to pay accrued royalties back to the execution date of the Settlement

4

Agreement. Stauffer refused, and Liberto formally terminated the license, although Stauffer continued to use the design.

Then, on March 10, 2004, the district court ruled on the parties' cross-motions for summary judgment, granting partial judgment for Liberto on his claim of federal trademark infringement, Texas trademark infringement, trademark dilution, unfair competition, and breach of contract. The district court enjoined Stauffer from use of the striped design and ordered the surrender or destruction of all packaging, advertisements, or other materials on which the mark appeared. Stauffer appeals the grant of injunctive relief.

II

"We review a grant of injunctive relief for abuse of discretion; findings of fact for clear error; and conclusions of law *de novo*."[1] "The district court abuses its discretion if it (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief."[2]

---

[1] *Commun. Workers of Am. v. Ector County Hosp. Dist.*, 392 F.3d 733, 737 (5th Cir. 2004).

[2] *Peaches Entertainment Corp. v. Entertainment Repertoire Assocs.*, 62 F.3d 690, 693 (5th Cir. 1995).

III

In support of the injunction, the district court held that the Settlement Agreement was an enforceable contract under Texas law. Stauffer argues that the Settlement Agreement is an unenforceable "agreement to agree."  We agree.

The validity of the Settlement Agreement turns largely on the text of the agreement itself, with repairs to the reading given it by the parties in their performance, such as Stauffer's quarterly royalty payment made under the Settlement Agreement.

Under Texas law, settlement agreements are "enforceable in the same manner as any other written contract."[3]  A contract is "legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations."[4]  An agreement to make a contract at a future time is enforceable if it is "specific as to all essential terms."[5]  By contrast, where an agreement leaves essential terms open for future negotiations, it is not a binding contract but, rather, an unenforceable "agreement to agree."[6]  Thus, whether the Settlement Agreement is an enforceable contract turns upon whether its "essential terms" are

---

[3] *Martin v. Black*, 909 S.W.2d 192, 195 (Tex. App. Houston 1995, writ denied).

[4] *Fort Worth Independent School Dist. v. City of Fort Worth*, 22 S.W.3d 831 (Tex. 2000).

[5] *Id*. (quoting *Foster v. Wagner*, 343 S.W.2d 914, 920-21 (Tex. Civ. App. El Paso 1961)).

[6] *Id*. (citing *Pine v. Gibraltar Savings Ass'n*, 519 S.W.2d 238, 244 (Tex. Civ. App. Houston 1975)).

6

set forth in the agreement or are left to future negotiation.

Whether a given term is "essential" to a contract is matter of law to be reviewed *de novo*,[7] a determination turning largely on the type of contract at issue,[8] and Liberto contends that it is enforceable as a license agreement. We ask then whether, according to Texas law, the Settlement Agreement contains all of the essential terms of a trademark license agreement.

As a general matter, Texas courts have consistently held that a contract may be held void for indefiniteness if it fails to specify "the time of performance, the price to be paid, the work to be done, the service to be rendered, or the property to be transferred."[9] The Settlement Agreement expressly enunciates the general scope of the license: an "exclusive license" to use Liberto's "red and yellow stripes Trademark...in the sale of Animal Crackers." The Settlement Agreement also stipulates the amount to be paid in royalties: "0.38% of gross revenue from sales of Animal Crackers," with an annual minimum and maximum of $62,500 and $150,000, respectively, "to be adjusted annually according to the U.S. Consumer Price index."

---

[7] *See*, *e.g.*, *America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 625 (Tex. App. San Antonio 1996).

[8] *See T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992).

[9] *See*, *e.g.*, *Engelman Irrigation Dist. v. Shields Bros., Inc.*, 960 S.W.2d 343, 352 (Tex. App. Corpus Christi 1997) (quoting *University National Bank v. Ernst & Whinney*, 773 S.W.2d 707, 710 (Tex. App. San Antonio 1989)).

However, the grant language of the Settlement Agreement is in the future tense, for example: "Plaintiff *will* grant to Defendant an exclusive license..." (emphasis added). The Settlement Agreement expressly leaves open for future negotiation the "specific terms" of the license, and the "action to be taken [by the parties] to protect the trademark." Other terms are simply omitted—neither specified nor designated for future negotiation. Most notably, the Settlement Agreement fails to mention the duration of the license or the grounds for its renewal or termination.[10] Also, the time of performance was not manifest in the Settlement Agreement, as evidenced by the protracted arbitration to determine the effective date of the royalty payments.

Recognizing the attendant risk in granting any trademark license—the possibility that the licensee will use the mark in a way that undermines its secondary meaning, thereby potentially rendering the mark generic[11] or abandoned—[12] nearly all licensing

---

[10] "The term of the license should be specifically stated in the license because the law of some states provides that a license without a stated term is terminable at the will of either party upon reasonable notice." *See* MCCARTHY § 18:43.

[11] *See* MCCARTHY § 17:8 ("If a 'trademark' symbol is used as a generic name of a product or service, it ceases to function to identify a single source of that generic thing. ... Sometimes a mark becomes abandoned to generic usage as a result of the trademark owner's failure to police the mark, so that widespread usage by competitors leads to a generic usage among the relevant public, who see many sellers using the same word or designator.").

[12] *See* MCCARTHY § 17:6 ("Licensing a mark without adequate control over the quality of goods or services sold under the mark by the licensee may cause the mark to lose its significance as a symbol of equal quality-hence, abandonment.");

8

agreements contain clauses specifying the manner in which the licensed mark may be used. "In a license, the licensee is engaging in acts which would infringe the licensor's mark but for the permission granted in the license. In that event, quality control is *essential*."[13] Given its centrality, leaving necessary terms of control to be determined in future negotiations militates against the finding of a binding contract. About this reality, Liberto says that he is entitled to "rely upon the reputation of the licensee" in lieu of formal quality control strictures. This is unpersuasive. Liberto intended that some mechanism would ultimately be implemented, yet there is no evidence that the parties later agreed upon specific methods of protecting the mark.

Liberto argues that, even if the Settlement Agreement were not a binding contract when executed in 1998, Stauffer nonetheless ratified it by making an initial royalty payment in August 1999. We are not persuaded. Under Texas law, a contact is ratified when a party recognizes its validity by acting under it or by

---

*see also Exxon Corp v. Oxxford Clothes*, 109 F.3d 1070, 1075 (5th Cir. 1997) ("A naked license is a trademark licensor's grant of permission to use its mark without attendant provisions to protect the quality of the goods or services provided under the licensed mark. A trademark owner's failure to exercise appropriate control and supervision over its licensees *may* result in an abandonment of trademark protection for the licensed mark" (internal citations omitted).).

[13] McCarthy on Trademarks and Unfair Competition § 18:79 (4th ed.) (emphasis added), cited in, *Brennan's Inc. v. Dickie Brennan & Co., Inc* 376 F.3d 356 (5th Cir. 2004).

9

affirmatively acknowledging it.[14]  The difficulty here is that the Settlement Agreement never had sufficiently definite terms.[15]  Any subsequent affirmative act, unless it created an enforceable contract in its own right, is, at most, only another non-binding promise.  Nothing in the record suggests that the parties agreed upon the duration of the contract, the enforcement mechanisms, or any of the outstanding terms during the period prior to Stauffer's royalty payment.

We conclude that the Settlement Agreement was an agreement to agree, not a contract, and Stauffer's failure to pay royalties was not a breach of contract warranting injunctive relief.

IV

The district court held, in part, that since Stauffer could have relied upon its incontestability defense in the 1996 litigation but, instead, chose to settle, it is precluded from contesting the merits or raising any affirmative defenses in this action involving the same trademark infringement cause of action.[16]  Stauffer contends that trademark infringement has never been

---

[14]  *See*, *e.g.*, *Wetzel v. Sullivan, King, & Sabom*, 745 S.W.2d 78, 81 (Tex. App. Houston 1988).

[15]  *See Engleman Irrigation Dist.*, 960 S.W.2d at 352; *Harris v. Archer*, 134 S.W.3d 411, 427 (Tex. App. Amarillo 2004) (stating "[a] void contract cannot be ratified; a voidable contract can be ratified").

[16]  Settlement agreements waiving substantial rights of parties and compromising a disputed liability are as conclusive as judgment following full litigation.  *See J. Kahn Co. v. Clark*, 178 F.2d 111, 114 (5th Cir. 1949).

adjudicated, that the district court erred in ruling for Liberto, and that judgment should be rendered in its favor.[17] We conclude that the district court should not have applied the doctrines of *res judicata* and judicial and licensee estoppel.[18]

A.

*Res judicata* applies only where (1) the parties to the respective actions are identical; (2) the prior judgment was rendered by a court of competent jurisdiction; (3) the prior action resulted in a final judgment on the merits; and (4) the same cause of action is involved in both cases.[19] "The res judicata effect of a prior judgment is a question of law that we review *de novo*."[20] "When 'reasonable doubt exists as to what was decided in the first action, the doctrine of res judicata should not be applied.'"[21] As only element (3) is disputed, the applicability of *res judicata*, here, turns on whether the Final Judgment in the 1996 litigation qualifies as a judgment "on the merits." We are persuaded that it

---

[17] The invalidity of the Settlement Agreement as an enforceable license agreement bears no relevance on the enforceability of the judgment entered by the court in the 1996 litigation, as Stauffer contends. All of the case law which Stauffer cites in support of its contention concerns the invalidity of judgments on jurisdictional grounds.

[18] Licensee estoppel is inapplicable because the Settlement Agreement is not a valid license agreement, as we explained.

[19] *See Russell v. SunAmerica Securities, Inc.*, 962 F.2d 1169, 1172 (5th Cir. 1992).

[20] *See Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 313 (5th Cir. 2004).

[21] *Mohamed v. Exxon Corp.*, 796 S.W.2d 751, 755 (Tex. App. 1990) (quoting *In re Braniff Airways*, 783 F.2d 1283, 1289 (5th Cir. 1986)).

11

does not.

No court has ever adjudicated the merits of Liberto's trademark infringement claim. The Final Judgment entered in the 1996 litigation is a one page document, incorporating the Settlement Agreement by reference, not mentioning any of the substantive infringement issues raised by Stauffer.[22] The district court in the 1996 litigation neither found trademark infringement nor decided the merits of Stauffer's incontestability defense.

Of course there are circumstances where "a settlement agreement approved and embodied in a final judgment of the court is entitled to full res judicata effect."[23] *Res judicata* applies where the parties to a settlement objectively manifest an intent to cement their agreement with claim preclusion.[24]

---

[22] The full text reads:

> The court has been fully informed that the parties have compromised and settled their differences in the form of a "Settlement Agreement" which is attached hereto as Exhibit A. The court specifically finds the Settlement Agreement sufficiently defines the terms of the settlement between the parties.

> It is ORDERED that the Settlement Agreement attached hereto be entered as the judgment of this Court. Any other relief requested herein that is not provided for in the Settlement Agreement is hereby denied.

> Each side to bear its own attorney's fees and costs.

[23] *Matter of West Texas Marketing Corp.*, 12 F.3d 497, 500 (5th Cir. 1994) (internal quotations omitted).

[24] "Thus, when determining the effect to be given a decree entered by consent of the parties, consideration is to be given to their intention with respect to the finality to be accorded the decree as reflected by the record and the words of their agreement." *Kaspar Wire Works, Inc. v. Leco Engineering & Machine, Inc.*, 575 F.2d 530, 540 (5th Cir. 1978) (holding that a consent judgment dismissing a prior declaratory judgment action alleging patent invalidity and

However, the Settlement Agreement contains no clear statement regarding *res judicata*, reading, in relevant part:

> Plaintiff will grant to Defendant an exclusive license to use its alternating red and yellow stripes Trademark for Defendant's use in the sale of Animal Crackers, the specific terms of such license to be agreed upon.

Also, Stauffer did not in the settlement agreement renounce its rights to its own registered mark as a condition of the settlement.

Likewise, the Settlement Agreement does not tacitly adjudicate the merits of trademark infringement. Resolution of a trademark infringement case via a settlement agreement need not necessarily result in an adjudication of the merits; simply because Stauffer agreed to negotiate a license for the use of Liberto's mark in the context of a trademark infringement action does not demand the conclusion that Stauffer's mark is infringing.[25] It signifies only that Stauffer will pay to use Liberto's mark, independent and irrespective of the viability of its own mark. In fact, the language of the Settlement Agreement can fairly be read to distinguish the two marks, reinforcing their distinctiveness rather than relinquishing Stauffer's ownership. In short, the language of the Settlement Agreement is, at best, inconclusive, offering little support for finding that incorporating it into an agreed judgment

non-infringement did not bar the defendants from contesting the validity of plaintiffs' patent because the parties did not specifically include the patent that was the subject of this lawsuit in their consent judgment).

[25] "[T]he purpose of a consent decree is typically to avoid the litigation of any issue." *Kaspar Wire Works, Inc.*, 575 F.2d at 539.

gave it any preclusive teeth.

Liberto argues that the Settlement Agreement effectuates Stauffer's renunciation of rights in its mark, but there is no evidence that Stauffer was of that mind. Beyond the conclusory statement that Stauffer had agreed to forgo its defenses in exchange for the right to negotiate a license,[26] Liberto only cites Stauffer's Advisory to the Court in support of its contention. However, the Advisory–leading to the entry of the Settlement Agreement as Final Judgment–does not admit infringement. Rather, it shows Stauffer's consent to incorporating the Settlement Agreement into a Final Judgment.[27]

The district court pointed to the principle that *res judicata* bars claims or defenses that were or could have been raised during a previous litigation.[28] "As we have previously put it: 'The effect

---

[26] Even so, foregoing such a defense is not the equivalent of an adjudication of trademark infringement.

[27] Granting summary judgment in favor of Stauffer is inappropriate on the record before this Court because we must accept Liberto's testimony as true. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is, at least, a fact question as to whether Stauffer manifested an intent to forgo its defenses for the benefit of the license agreement to be negotiated.

[28] The doctrine of *res judicata* "treats a judgment, once rendered, as the full measure of relief to be accorded between the same parties on the same 'claim' or 'cause of action.' [It] incorporates the doctrines of merger and bar, thereby extending the effect of a judgment to the litigation of all issues relevant to the same claim between the same parties, whether or not those issues were raised at trial." *St. Paul Mercury Ins., Co. v. Williamson*, 224 F.3d 425, 436 (5th Cir. 2002) (holding that the successful defense of fraud in a negligence action is not *res judicata* as to a subsequent action brought by the defendant for malicious prosecution) (citing *Kaspar Wire Works, Inc.*, 575 F.2d at 535). "If [the four] conditions are satisfied, claim preclusion prohibits either party from raising any claim or defense in the later action that was or *could have been* raised in support of or in opposition to the cause of action asserted in the prior action." *U.S. v. Shanbaum*, 10 F.3d 305, 310 (5th Cir. 1994) (citing *In re*

14

of a judgment extends to the litigation of all issues relevant to the same claim between the same parties, whether or not raised at trial.'"[29]  Stauffer did not raise its incontestability defense during the 1996 litigation, though having earlier raised the issue in a declaratory judgment action in Pennsylvania district court.[30] However, the parties turned to an alternative solution to quieting the lawsuit–an agreement to pursue a license to use Liberto's mark, pretermitting a determination of liability.[31]  And, agreeing to a license is consistent with Stauffer maintaining rights in its own mark, particularly where no language in the Settlement Agreement precludes a later assertion of rights to the registered mark.  The cases cited by the district court do not resolve our issue because there was never an express or implied adjudication on the merits of trademark infringement, a necessary predicate to *res judicata*.

Such a result neither betrays the equities in the case nor

---

*Howe*, 913 F.2d 1138, 1144 (5th Cir. 1990)).

[29]  *Shanbaum*, 10 F.3d at 310-311 (quoting *Kaspar Wire Works*, 575 F.2d at 535); *see also Allen v. McCurry*, 101 S. Ct. 411, 414 (1980) (dealing with the applicability of claim preclusion to § 1983 actions and stating that claim preclusion applies to claims that "were or could have been raised" in a prior action that involved "the parties or their privies" when the prior action had been resolved by "a final judgment on the merits").

[30]  He did so in a declaratory judgment action filed in Pennsylvania, which was dismissed for lack of personal jurisdiction over Liberto after the commencement of Liberto's 1996 infringement action in Texas.  Stauffer filed a motion to stay the proceedings in Texas pending the outcome of the Pennsylvania case.  After the dismissal in Pennsylvania, Stauffer and Liberto petitioned the district court in Texas to allow the parties to commence arbitration.

[31]  "Judicial finality -- the predicate for res judicata -- arises only from a final decision rendered after the parties have been given a reasonable opportunity to litigate a claim before a court of competent jurisdiction." *Kaspar Wire Works, Inc.*, 575 F.2d at 537-538 (citations omitted).

15

offends public policy.  Stauffer gained nothing by delaying the ultimate adjudication of the case, all the while attempting to negotiate a license,[32] and Liberto would not likely have prevailed in its 1996 action had Stauffer not agreed to enter into the negotiations detailed by the Settlement Agreement, later entered as a Final Judgment.

The Final Judgment ordered by the district court neither clearly expresses nor is predicated upon the conclusion that Stauffer infringes Liberto's mark.  The Final Judgment in the 1996 litigation did not resolve the dispute.  It was final only in its name.

B.

The district court also found that Stauffer was judicially estopped from raising any defense to trademark infringement in the 2002 litigation.  Where a party successfully urges a particular position in a prior legal proceeding, the doctrine of judicial estoppel prevents it from "taking a contrary position in a subsequent proceeding where its interests have changed."[33]  We have identified two limitations to its application: "(1) it may be applied only where the position of the party to be estopped is clearly inconsistent with its previous one; and (2) [the] party

---

[32]  The district court found and it is not contested that Stauffer did not engage in bad faith negotiations.

[33]  *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996).

16

must have convinced the court to accept that previous position."[34]

The district court found that Stauffer was estopped from advancing any affirmative defense to its liability to Liberto because it "chose to abide by [Liberto's] Motion to Enter judgment when it filed its Advisory to the Court" in the 1996 litigation. Stauffer responds, arguing that it did not urge or convince the court to accept any position in conflict with its defense to trademark infringement. Rather, Stauffer contends that it merely filed an Advisory stating that it did not oppose Liberto's motion to enter the Settlement Agreement as Final Judgment, a settlement which purported only to bind the parties to further license negotiations. We agree with Stauffer and hold that the district court erred in its finding of judicial estoppel.

V

The Lanham Act gives to district courts power to issue injunctions, "according to the principles of equity and upon such terms as the court may deem reasonable to prevent the violation of any right of the registrant of a mark."[35] Trademark infringement remains to be decided, including Stauffer's incontestability

---

[34] *In re Coastal Plain, Inc.*, 179 F.3d 197, 206 (5th Cir. 1999).

[35] 15 U.S.C. § 1116; *see also Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 369 (5th Cir. 2000). The issue of damages pursuant to 15 U.S.C. § 1117(a) is not properly before this court.

17

defense and any improper cross-merchandising.[36]  Thus, the district court abused its discretion in issuing the injunction; we vacate and remand for further proceedings, consistent with this opinion.

VACATED and REMANDED.

---

[36]  The test for trademark infringement is likelihood of confusion–a fact question.  *See Scott Fetzer Co. v. House of Vacuums, Inc.*, 381 F.3d 477, 482 (5th Cir. 2004).  The record before us does not adequately develop the issue. However, Stauffer asserts its incontestability defense, against which Liberto offers no substantive rebuttal in his motions for summary judgment.  Liberto argues the inadequacy of Stauffer's description of color in the trademark registration, but this is not an exception to the incontestability of a trademark.  *See Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 690 (5th Cir. 1992).  Still, Stauffer may have waived his incontestability defense.